UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JOSEPH C. WIESE,                          )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )          No.  2:13CV0075 TIA
                                          )
CAROLYN W. COLVIN, Commissioner           )
of Social Security,                       )
                                          )
                    Defendant.            )

**MEMORANDUM AND ORDER
OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves applications for Disability Insurance Benefits under Title II of the Social

Security Act and for Supplemental Security Income under Title XVI of the Act.  Claimant has

filed a Brief in Support of his Complaint; the Commissioner has filed a Brief in Support of her

Answer. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. §

636(c).

**I.     Procedural History**

On August 31, 2010, Claimant filed Applications for Supplemental Security Income

payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et. seq.  (Tr. 206-

09) and for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr.

210-16)[1] alleging disability since April 30, 2010[2] due to arthritis, degenerative disc disease,

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer.
(Docket No. 12/filed October 28, 2013).

[2]At the hearing, Claimant though his attorney amended his alleged onset date of disability
from January 1, 2008, to April 30, 2010.  (Tr. 32-34).

bipolar, depression, hip problems, fibromyalgia, and pinched nerves in his neck. (Tr. 94). The applications were denied (Tr. 53-57), and Claimant subsequently requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 101-02). On September 7, 2011 a hearing was held before an ALJ and on May 8, 2012, a supplemental hearing was held. (Tr. 30-53, 54-72). Claimant testified and was represented by counsel. (Id.). Dr. John Pollard, the medical expert, and Vocational Expert Gail Leonhardt also testified at the supplemental hearing. (Tr. 56-65, 68-71, 195-96, 201-02). In a decision dated July 27, 2012, the ALJ found that Claimant had not been under a disability as defined by the Social Security Act. (Tr. 8-24). After considering the letter from Dr. John Small, the Appeals Council denied Claimant's Request for Review on March 26, 2013. (Tr. 2-7). Thus, the ALJ's decision is the final decision of the Commissioner.

## II. Evidence Before the ALJ

### A. Hearing on September 7, 2011

At the hearing on September 7, 2011, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 30-53). His date of birth is September 13, 1974. (Tr. 37). He lives in an apartment through public assistance. (Tr. 49). He does not have a driver's license, and his parents take him shopping. (Tr. 50). Claimant lost his license due to his failure to pay child support. (Tr. 51).

Claimant testified that Dr. John Collins of the Kirksville Complete Family Medicine treats for his episodes of abscesses in his anal, scrotum, and groin areas. (Tr. 37). He explained that the abscesses start with a lump and then the area around it turns red and feverish and a pocket of infection forms and then comes to a head and starts to drain. (Tr. 38). Claimant testified that the abscess occurs within a week time period unless the abscess is lanced open and drained. The

open pocket underneath the skin created by the abscess reinfects and has to be reopened. (Tr. 38). He is treated with an antibiotic. (Tr. 40). When the abscess is located in his groin, scrotum, or anal area, sitting increases the pain, and lying down in his underwear with a wash clothe helps alleviate the pain. (Tr. 39). Claimant indicated that he may go a month without an abscess, but then he has two in another month, and he has no way of projecting when he will have one. (Tr. 39). He testified the abscesses will be reoccurring. (Tr. 40). He was hospitalized once to drain an abscess in June, 2010. (Tr. 41). The severe pain from the abscesses interferes with his sleep. (Tr. 43). He takes hydrocodone to alleviate his pain and experiences no side effects from the medication. (Tr. 43).

His problems with his cysts started in 1998 when Claimant had a pilonidal cyst. (Tr. 45). Claimant acknowledged that he had worked with his cyst problem. (Tr. 45).

Claimant last worked at Four Quarters Construction doing house remodeling in December, 2007. (Tr. 45). He stopped working due to his physical conditions including his back and neck pain, fibromyalgia, arthritis, and degenerative disc disease. (Tr. 46). The cysts had something to do with his no longer working, because he was missing a lot of work due to loss of sleep. In 2007, Claimant testified that he had two to three cysts. (Tr. 46). He indicated that he had shared his cyst problems with his friend, Sean Fratheim. (Tr. 47). The ALJ noted how Claimant failed to list his cyst problem on his applications as a disabling condition preventing him from working. (Tr. 47).[3]

---

[3]As noted by the ALJ, Claimant failed to alleged the abscesses to be disabling impairments in his applications. The fact that Claimant did not allege these impairments in his applications for disability benefits is significant, even though some evidence of the impairments was later developed. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression was later developed).

Claimant testified that he learned four months earlier that he has diabetes. (Tr. 40). He is depressed, and he experiences manic states. (Tr. 41). Claimant takes medications for his mental health conditions. (Tr. 42). Cindy Mayberry has treated him for at least six months. He was hospitalized at Hannibal Regional for treatment. (Tr. 42). Claimant has an inhaler for his breathing problem. (Tr. 45).

In a six-month time period, Claimant testified that he would have to miss work a couple days each month due to the lack of sleep. (Tr. 44). He has an abscess every two to three months. (Tr. 44). Claimant testified if he had an abscess flaring up he would not be able to work, because he could not sit all day. (Tr. 40)

Claimant spends most of the day watching television, and he sometimes attends a 12-step meeting with a friend. (Tr. 44). He last consumed alcohol on February 17, 2005. (Tr. 44).

At the end of the hearing, the ALJ noted he would schedule a supplemental hearing with a medical expert to address if his diabetes causes the cysts. (Tr. 52).

**B. Supplemental Hearing on May June, 2012**

At the hearing on June 8, 2012, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 54-72). Dr. John Pollard, the medical expert, testified that Claimant had perianal abscesses drained in May 2010, October 2010, and May 2011 and was seen in April 2012 for an anal fissure and a colonoscopy was done on August 10 to rule out inflammatory bowel disease. (Tr. 59). The colonoscopy was negative except for a polyp which was removed. Dr. Collins wrote a letter in March 2012 opining that Claimant has dozens of perianal abscesses, but Dr. Pollard noted this is not reflected in the record. (Tr. 59).

Dr. Pollard testified that he is not able to determine the cause of the abscesses but noted

that the colonoscopy in August 2010 ruled out inflammatory disease as a cause. (Tr. 62). Dr. Pollard opined individuals with diabetes tend to get infections and if the abscess does not drain spontaneously, a surgeon would incise and drain the abscess. An individual with an infection would have pain. (Tr. 62). Dr. Pollard opined that the reoccurring abscesses would impose some work-related limitations such as he could not sit for six hours and would need to get up and move around. (Tr. 64). Dr. Pollard further opined that his pushing/pulling would be unlimited; he could occasionally crawl, stoop, or bend; and he should avoid extreme cold and noxious fumes because of his diagnosis of bronchial asthma. (Tr. 64).

Claimant testified that he has had four or five abscesses since the last hearing. (Tr. 66). The shortest period of time for recovery from an abscess is over two weeks. (Tr. 68).

### 2. Testimony of Vocational Expert

Vocational Expert Gail Leonhardt testified in response to the ALJ's questions. (Tr. 68-71).

The ALJ asked Ms. Leonhardt to assume that

an individual 35 - 37 years of age with a high school education, no relevant past work for purposes of my question. I'd like you to assume that the individual is able to perform a full range of light exertional work, as that term is defined, with the following additional limitations. With respect to sitting they would be limited to two hours of sitting in an eight-hour day. The individual would need to avoid environments containing extreme cold, heat, or concentrated exposure to smoke, fumes, dust, gases.... Please tell us, in your opinion, would the hypothetical individual I described be able to perform any unskilled occupations that exist in the national, regional, or local economy?

(Tr. 69-70). Ms. Leonhardt opined that Claimant could work as a sales attendant, a light, unskilled job where there are 4,037 jobs available in the four-state region and 88,015 jobs available nationally. (Tr. 70). In addition, such individual would be able to perform work as an

office helper, a light, unskilled job where there are 10,866 jobs available in the four-state region and 224,097 jobs available nationally. Ms. Leonhardt further opined that Claimant could work as a production assembler, a light, unskilled job where there are 1,920 jobs available in the four-state region and 40,998 jobs available nationally. (Tr. 70).

The ALJ next asked Ms. Leonhardt to assume his previous question but "the individual is also limited to performing simple and repetitive tasks, would that change you response any to my first question?" (Tr. 71). Ms. Leonhardt responded no. Then the ALJ asked if he were to add "the following limitation, the individual would miss a period of one to two weeks of being able to report and perform work, and that one to two weeks would be missed on an average of every one or two months, would that change your response any to my first question?" (Tr. 71). Ms. Leonhardt indicated that would change her response inasmuch as this limitation would make sustaining employability unfeasible. (Tr. 71).

### 3. Forms Completed by Claimant

In the Disability Report - Adult, Claimant noted he stopped working on December 28, 2007 because of his conditions and indicated on January 14, 2007, his conditions caused him to make changes in his work activity. (Tr. 256).

In the Function Report Adult, Claimant reported doing the dishes and the laundry, cleaning, watching television, going to meetings, reading, and cooking as his daily activities unless he is down for the day. (Tr. 267, 269). He listed going to meetings, talking on the phone, and emailing as his social activities. (Tr. 271).

In the Function Report Adult - Third Party, Sean Fratheim, a friend, reported Claimant attends recovery group three to four times a week. (Tr. 286-93).

## III. Medical Records

The April 2, 2009 MRI of his cervical spine showed at C3-C4 moderate to severe left foraminal stenosis secondary to degenerative disease. (Tr. 504). The MRI of his lumbar spine had normal findings. (Tr. 505).

On September 3, 2009, Claimant was voluntarily admitted to the University of Missouri Health Care due to symptoms of depression and suicidal thoughts after presenting himself to the emergency department. (Tr. 429, 435). He reported multiple stressors including homelessness, losing custody of his children, having his assets auctioned off to pay for child support, end of relationship with girlfriend, having to move multiple times, no transportation, and ongoing poor physical health. (Tr. 429, 435). He reported being disabled and unable to work because of his arthritis, fibromyalgia, and degenerative disc problems. (Tr. 429). At the time of admission, Claimant was placed on suicide observation and seizure precautions and his assessed GAF score was 35. (Tr. 430). A neurological examination showed bilateral suboccipital tenderness with reproduction upon palpitation. He complained of multiple stressors primarily related to financial problems, homelessness, and lack of employment. His mood and behavior continued to improve throughout the hospitalization, and he reported that he was feeling better. (Tr. 430). Claimant reported smoking cigarettes. (Tr. 437). During the neurology consultation, the doctor found the examination to be remarkable for bilateral suboccipital tenderness with reproduction of the headache. (Tr. 441). At the time of discharge, his assessed GAF score was 85, and he was referred to outpatient treatment as follow-up treatment. (Tr. 430).

On March 31, 2010, Claimant received treatment in the emergency room at Moberly Regional Medical Center for groin pain and headache. (Tr. 303-05).

In the April 1, 2010 assessment, the treating doctor noted Claimant to be able to perform all activities of daily living without assistance. (Tr. 306).

On May 21, 2010, Claimant sought treatment in the emergency room at Northeast Regional Medical Center for abscess in groin and scrotum. (Tr. 325). The emergency room doctor requested Claimant be seen by Dr. David Kermode for consultation. (Tr. 331). Claimant reported having a history of pilonidal cyst and a past medical history of degenerative joint disease, arthritis, depression, bipolar disorder, and fibromyalgia. (Tr. 331). Dr. Kermode recommended draining the abscess under anesthesia. (Tr. 332).

On May 23, 2010, Dr. Kermode drained a perianal abscess and placed a Penrose drain. (Tr. 328). Dr. Kermode noted Claimant had some inappropriate behavior throughout his hospitalization including exposing himself on numerous occasions to hospital staff. (Tr. 329). He opined that Claimant has other issues that need to be addressed from a mental health standpoint. Examination showed Claimant to have greatly improved from his initial presentation to the emergency room. (Tr. 329). The operative report included the diagnosis of perianal abscess, right groin. (Tr. 340). Dr. Kermode drained Claimant's perianal abscess under anesthesia. (Tr. 340). Dr. Kermode noted he would hospitalize Claimant over night for pain control. (Tr. 341). The radiology report of post drainage of right perirectal abscess showed no abscess cavity fluid collections remain. (Tr. 338).

On May 27, 2010, Claimant returned to the emergency room and reported having increased pain and bleeding. (Tr. 342-44).

Claimant was treated status post drainage of an abscess in the perianal region on June 4, 2010. (Tr. 319). Dr. Kermode examined him and found he had made a remarkable recovery.

(Tr. 319).  On June 11, Dr. Kermode noted that although the Penrose drain was to be removed during treatment, Claimant removed the drain a week earlier due to discomfort.  (Tr. 320).  After removing the drain, he sought treatment in the emergency room because he thought there might be persistent abscess fluid and after being told this was not the case, he returned for follow-up treatment as prescribed.  Examination showed the area to be healing well, and Dr. Kermode opened an abscess within the anal canal.  Dr. Kermode found there to be no evidence of persistent abscesses or of abnormality.  Dr. Kermode prescribed Augmentin for another week and prescribed Lortab and noted would schedule Claimant for a colonoscopy to determine whether he has inflammatory bowel disease or other precipitating problem leading to the development of this abscess. (Tr.320).  In follow-up treatment on June 23, Dr. Kermode found nothing appearing to be a gross recurrence but basically pain.  (Tr. 321).  Dr. Kermode opined that due to his persistent discomfort, he worries about the possibility of a deep abscess and ordered a CT of his pelvis. (Tr. 321).

In the June 24, 2010, clinic note, Dr. Kinshuk Sahaya found due to the relatively recent onset headache then becoming chronic, Claimant should have neuro imaging and EEG, but he is unable to afford due to his financial situation.  (Tr. 384-85).  Dr. Sahaya noted having seen Claimant as an inpatient consultation on September 8, 2009 for headaches while he was admitted for voluntary admission for suicidal ideation.  (Tr. 383).  He reported having headaches for the last several years and described them as sharp stabbing pain with episodes of spasms in his face. (Tr. 383).  Dr. Sahaya recommended Claimant start taking Neurontin and Flexeril.  Dr. Sahaya performed a left suboccipital nerve block and opined he suspected Claimant has an underlying migraine.  (Tr. 385).

In the June 28, 2010 psychiatric evaluation on referral by the Adair County Division of Family Services as part of his application for Medicaid, Dr. Jeffrey Harden, D.O., noted Claimant believes himself to be disabled by physical pain and severe depression. (Tr. 309). In terms of his daily activities, he reported being capable of driving and usually doing his own cooking, laundry, housekeeping, and shopping at the store but occasionally his physical pain prevents him from being able to successfully engage in these activities. (Tr. 309). Screening of his cognitive functioning revealed his to be fully oriented to person, place, and time. (Tr. 310). Dr. Harden included in the diagnostic impression how Claimant has difficulty sustaining employment and accessing healthcare. (Tr. 311). Dr. Harden opined that he was in need of ongoing specialized mental health care. (Tr. 311).

During an office visit on July 14, 2010, Claimant presented with complaints of pain and arthritis. (Tr. 312). Dr. Kermode reported he treated Claimant for a perianal abscess some weeks ago and had ordered a CT of the pelvis, but he has not yet been approved for Medicaid, and he cannot afford to pay for CT scan. (Tr. 312). For treatment, Janet Corbett, D.O., ordered him to soak in warm water for twenty minutes three to four times a day and prescribed Bactrim. (Tr. 313). In follow-up treatment on July 28, Claimant reported now having Medicaid coverage and experiencing rectal bleeding. (Tr. 314). On August 5, 2010, he complained of pain in lower back, perianal cysts, syncope, and depression. (Tr. 316).

On July 21, 2010, Rachael Arnold, MSW, PLCSW, completed a psychosocial/clinical assessment. (Tr. 395). Claimant reported being homeless and being very depressed. He noted he wanted to secure employment. (Tr. 395). Claimant described his physical health to be poor and has been historically treated for bipolar I disorder, ADHD, and depression. (Tr. 396). He has

received inpatient treatment for drug and alcohol issues on four to five occasions. (Tr. 397). He reported doing his own shopping and cooking, doing laundry, and washing dishes. (Tr. 398). Claimant indicated that he wants to re-enroll in college soon. (Tr. 398).

The July 30, 2010 radiology report of his abdomen showed surgical removal of the drain from right perirectal space and prominent right perirectal space subcutaneous emphysema and multifocal stranding density to be nearly resolved and no fluid collection to suggest phlegmon or abscess. (Tr. 349). Dr. Whitaker found there to be near complete resolution of previously identified diffuse inflammatory change and subcutaneous emphysema involving right perirectal fat space and no CT evident phlegmon or abscess. (Tr. 350).

In follow-up treatment on August 4, 2010, Claimant returned after having a CT examination of the lower abdomen and pelvis and reported now having a primary care physician, Dr. Corbett. (Tr. 322). Dr. Kermode found no evidence of persistent abscess and recommended having a lower endoscopy. (Tr. 322).

On August 7, 2010, Claimant sought treatment in the emergency room at Northeast Regional Medical Center for low back pain and reported having a history of degenerative disc disease due to working as a construction worker for twenty two years and doing excessive lifting. (Tr. 351-52).

The August 12, 2010, MRI of his brain showed unremarkable results. (Tr. 376, 380). The tests returned as normal. (Tr. 377). The EEG showed no interictal abnormalities or seizures. (Tr. 373).

On August 18, 2010, Dr. Reghnald Westhoff completed a psychiatric evaluation on referral by Claimant. (Tr. 391). Claimant reported "trying to get on disability for long term

problems with his mood disorder," fibromyalgia, degenerative disc disease, arthritis, and collapsed disc of his lower back.  He reported two suicide attempts, one in 2000 when he was losing his job and in a rocky marriage.  The psychiatric review of his symptoms showed his mood to be generally okay.  (Tr. 391).  His social history includes playing solitaire, reading a lot, and being very active in AA meetings.  (Tr. 392).  Claimant reported last working doing construction work in December 2007, but he had to stop due to his pain and passing out as a result of nerves pinching his neck.  (Tr. 393).  He noted he tried to get treatment for a cyst for over one year and experienced excruciating pain until he received appropriate treatment.  Claimant denied any problems with delusions or visual hallucinations and denied any current suicidal thoughts.  (Tr. 393).  Claimant reported his mood is doing fairly well at this time, but he has a chronic issue with not being able to sleep, and he sometimes does not sleep for two to three days.  (Tr. 394).  Dr. Westhoff recommended increasing his Abilify dosage, restart Lamictal, and return for follow-up in three to four weeks.  (Tr. 394).

On August 26, 2010, Dr. Kermode performed a colonoscopy as treatment for bowel habit changes, and he removed a polyp  (Tr. 355-58).

On September 20, 2010, Claimant returned status post total colonoscopy, and Dr. Kermode noted draining an abscess in the perianal region.  (Tr. 324).  Dr. Kermode found no evidence of recurrent fissure or rectal mass and found Claimant to have an excellent result.  On the colonoscopy, Claimant did have one area of an adenomatous polyp in his colon and no evidence of inflammatory bowel disease.  Dr. Kermode ordered Claimant to return in three years for a colonoscopy.  (Tr. 324).

The September 21, 2010, radiology report of his abdomen noted pelvic calcifications that

may represent calcified foci within stool.  (Tr. 367).

On September 30, 2010, Claimant returned for follow-up treatment for left suboccipital neuralgia and underlying migraine.  (Tr. 369).  He reported the severity at a level nine.  After receiving a nerve block during his last visit, Claimant experienced improvement lasting two months.  (Tr. 369).  Dr. Sahaya performed an occipital nerve block as treatment of his headaches noting Claimant had a favorable response to the first block administered.  (Tr. 372).

Claimant received treatment at Kirksville Family Medicine from October 7, 2010 through June 27, 2011.  (Tr. 445-92).   He reported having an abscess and being out of Vicodin on October 7, 2010.  (Tr. 490).  In follow-up on October 21, he reported feeling better and able to cut down on Vicodin and improvement with abscess and fibromyalgia.  (Tr. 487-88).  He reported having an abscess drained two weeks earlier and having tenderness when sitting and with movement on November 3.  (Tr. 484).  He returned to have his abscess wound repackaged on November 4, 5, 6, 8, and 9.  (Tr. 479-83).  Claimant reported feeling much better.  (Tr. 479).  On November 17, he reported not having any perianal pain.  (Tr. 477).

In the October 28, 2010 Mental Residual Functional Capacity Assessment, Dr. Mark Altomari, PhD, found Claimant has the ability to understand, remember and carry out complex instructions, to relate appropriately to coworkers and supervisors, adapt to most usual changes common to a competitive work environment, and make simple work-related decisions.  (Tr. 402).

Cynthia Mayberry, an advanced practice nurse, treated Claimant from January 20, 2011 to August 2, 2011, every other month for therapy sessions.  (Tr. 420-27).  Claimant reported fishing and music as his interests.  (Tr. 426).  On March 16, 2011, he reported how he decided to apply to work at sheltered workshop.  (Tr. 423).

On January 7, 2011, Claimant was admitted to Hannibal Regional Hospital after "[t]alking with people about suicidal thoughts." (Tr. 494). He reported having had many problems for the last six years including becoming separated in 2005, having intermittent access to his children, being behind on child support, becoming homeless recently, having been in treatment for alcohol dependence, having two previous suicide attempts, and being injured and unable to work. He is currently taking Lamictal and Wellbutrin XL, and this medication regimen is partially controlling his symptoms. Dr. Lyle Clark noted how Claimant consistently denied having suicidal ideation throughout his hospitalization. (Tr. 494). He reported having made two suicide attempts and being followed by Reggie Westhoff at Preferred. (Tr. 498). He listed primary support problems including not being able to see his children, occupational problems including being disabled, housing problems including being homeless, economic problems including having no income, and legal system problems including being behind on child support as his psychological stressors. (Tr. 499). At the time of admission, he received a GAF of 21, and at discharge, he received a GAF of 55. (Tr. 495, 499). His discharge diagnosis included bipolar disorder, migraine headaches, low back pain, and compressed cervical disk. (Tr. 495). Dr. Clark noted that Claimant would be seen by Cindy Mayberry, APN, and prescribed Depakote, Loxitane, and Ativan as psychiatric medications. (Tr. 496).

In follow-up treatment at Kirksville Family Medicine on January 26, 2011, Claimant requested a new pain medication and received medication refills. (Tr. 473). On February 11, he reported having been in Hannibal Psych facility last month for suicide ideation and being depressed. (Tr. 471). On April 8, he reported chest pain and still smoking. (Tr. 466). On May 6, Claimant complained of back pain and reported he quit smoking as of that day. (Tr. 458).

On May 27, 2011, Claimant returned to the Kirksville Family Medicine clinic for removal of a scrotal abscess. (Tr. 451). On May 31, he reported feeling better and had the packing changed. (Tr. 449). On June 6, he presented for follow-up and the doctor noted that his scrotal abscess was almost completely healed. (Tr. 447).

In the September 6, 2011, Medical Source Statement, Ms. Mayberry completed the form with check marks finding Claimant to be markedly limited in his ability to understand, remember, and carry out detailed instructions and to maintain attention and concentration for extended periods. (Tr. 507). She also found him markedly limited in his ability to complete a normal workday and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 508). Ms. Mayberry also found him to be markedly limited in his ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 508).

In follow-up therapy on September 12, 2011, Claimant reported being frustrated because his hearing was postponed. (Tr. 526). Ms. Mayberry noted she would see Claimant on a bimonthly basis. (Tr. 526). On October 17, he reported waiting on disability and not accepting not being able to work. (Tr. 525). Ms. Mayberry evaluated the issues with him. (Tr. 525). On January 3, 2012, Claimant reported how he would be going to his SSI hearing on January 18, and he enjoyed Christmas. (Tr. 524). On January 9, he reported being nervous about his SSI hearing. (Tr. 523).

In a follow-up visit on November 3, 2011, Claimant complained of back pain with symptoms aggravated by sitting, sneezing, and walking. (Tr. 594). He scored at a level of moderate depression. (Tr. 594). Dr. Collins increased the dosage of hydrocodone for his spinal

stenosis in the cervical region/lumbar spine. (Tr. 596). Dr. Collins prescribed Wellbutrin XL for as treatment of his depression.

On November 23, 2011, Claimant returned to review labs with Dr. Collins and reported pain when sitting, walking, and standing. (Tr. 597). Diabetes mellitus without mention of complication is listed as his chronic problems. (Tr. 597). In the Neuro/Psychiatric review of symptoms, Dr. Collins noted negative for anxiety, depression, and psychiatric symptoms. (Tr. 598). Claimant to return in two days for removal of cyst to tail bone. Dr. Collins noted that he removed a cyst there years ago and now Claimant has another one. Dr. Collins prescribed Bactrim to clear up the infection and prescribed Oxycodone for pain. (Tr. 599).

On November 25, 2011, Dr. Collins removed a pilonidal cyst with abscess from his tail bone. (Tr. 601). Dr. Collins ordered a refill of oxycodone and increased MS Contin dosage to twice a day. (Tr. 601). He reported exercising two to three times a week. (Tr. 602). Claimant returned the next day to have the packing checked. (Tr. 605). Dr. Collins repacked the wound and advised Claimant to call if his symptoms worsened or did not improve. (Tr. 607). On November 28, the nurse repacked his abscess after he had a pilonidal cyst removed three days earlier. (Tr. 608). Although he reported having some pain, Claimant reported the medications "are actually working pretty good." The nurse noted he is taking oxycodone and contin for pain. He reported exercising two to three times a week in the social history. (Tr. 608). On November 30, he returned to have his abscess repacked and refilled Oxycodone prescription. (Tr. 591, 593). Claimant returned for repacking on December 2 and reported he is feeling well and having only minimal pain. (Tr. 587). The musculoskeletal examination showed a normal range of motion, muscle strength, and stability in all extremities with no pain. (Tr. 589).

On December 7, he presented for repacking and reported still having pain and some back pain between shoulder blades. (Tr. 583). Based on physical examination, osteopathic manipulative treatment was performed to lumbago area, and Claimant responded well to treatment. (Tr. 583, 585). Claimant returned on December 13, to have the wound repackaged. (Tr. 580). He exercises two to three times a week. (Tr. 580). When Dr. Collins repacked the wound on December 16, he denied pain to the wound. (Tr. 577). On December 19, he reported accidently pulling out packing and being very painful. (Tr. 573). Dr. Collins observed his wound heeling on schedule, and he repacked the wound, because is not quite closed all the way. (Tr. 575). On December 21, Dr. Collins removed packing and found no need to repack area. (Tr. 570-72).

In the January 26, 2012, Medical Interrogatory Physical Impairments - Adults, Dr. Richard Lavely listed bipolar disorder, arthritis, degenerative disc, migraines, hip problems, and fibromyalgia as his impairments. (Tr. 510). Dr. Lavely opined that Claimant has no physical problems that qualify for disability and noted bipolar disorder is beyond his expertise so he would defer to a psychiatrist to make a disability determination as to bipolar disorder. (Tr. 512).

In the Medical Source Statement of Ability to Do Work Related Activities (Physical), Dr. Lavely found Claimant able to lift and carry up to ten pounds continuously , and able to reach, handle, and push/pull continuously with both hands. (Tr. 514, 516). Dr. Lavely found he could never climb ladders or scaffolding and occasionally kneel, crouch, or crawl due to his abnormalities of his lower back, the mild encroachment of the cervical region C3-C4. (Tr. 517). Dr. Lavely opined that no normal person could stand extreme heat or extreme cold. (Tr. 518). Dr. Lavely further opined any work involving much interaction with others would be difficult

because of his psychiatric diagnosis.  (Tr. 519).

In the February 10, 2012 letter, Claimant's counsel responded to proffered interrogatory answers and disagreed with Dr. Lavely's assessment as follows:

> I do not believe his opinion is consistent with the record at all.  Neither 17F nor 18F [Dr. Lavely's assessments] make any mention of the claimant's recurrent perianal abscess impairment, which is a very significant limitation.  Dr. Lavery (*sic*) doesn't discuss the nature of the abscesses, the complications from the abscesses, or the exertional limitations resulting from the abscesses.  Dr. Lavery (*sic*) concludes the claimant is unrestricted in his ability to sit and stand.  This is simply not supported by the evidence.  The abscesses are mentioned throughout the record, ....  Treatment has included several surgical procedures ....
>
> I believe it would be beneficial to have a supplemental hearing to allow questioning regarding the vocational impact of these abscesses, in terms of both sitting limitations and in terms of absenteeism from work.
>
> I believe the combination of claimant's physical and mental impairments preclude any work on a sustained basis.  Thank you for your consideration.

(Tr. 301).

On February 2, 2012, Claimant returned for a medication refill for oxycodone and morphine and reported worsening back pain with his symptoms aggravated by standing and walking and relieved by pain medications.  (Tr. 567).  He indicated that his back has hurt for years.  (Tr. 567).  Dr. Collins refilled oxycodone and morphine for a month.  (Tr. 569). Hydrocolator applied as treatment for his lumbago pain, but he reported not feeling any better. He tolerated the osteopathic manipulative treatment well and improved after treatment.  (Tr. 569). Claimant reported having symptoms of a cyst in the groin area four days earlier on February 7 with the symptoms being moderate and occurring daily.  (Tr. 562).  He reported a cough and still smoking.  (Tr. 562).  He tried to stop smoking and did not smoke for six months.  (Tr. 563). Musculoskeletal examination showed a normal range of motion, muscle strength, and stability in

all extremities with no pain. (Tr. 565). Dr. Collins drained the cyst with an incision. (Tr. 565).

On March 1, 2012, Claimant returned for a medication refill and reported experiencing insomnia with worsening symptoms and depression. (Tr. 558). In the Neuro/Psychiatric review of symptoms, Dr. Collins noted positive for depression and difficulty sleeping and negative for anxiety, difficulty concentrating, personality changes, and psychiatric symptoms. (Tr. 560). Dr. Collins increased the MS Contin dosage as treatment of his chronic neck pain and refilled Prozac until he could see Ms. Mayberry. (Tr. 560).

In the March 5, 2012 letter, Dr. Collins noted as follows:

I have been Mr. Wiese's Primary Care Physician(PCP) of the last ten years. Over that period of time, Joe has developed Abscesses in the perirectal region more than a dozen times, that I can personally remember. He has had others that have been cared for by my partners as well. Despite his good hygiene habits, Joe suffers from there abscesses, or pockets of active infection, pus. As he has a phenomenon called Pilondial Cysts. These cysts are congenital, or present at birth. Though they may not pose a threat until adulthood. These cysts, or fluid filled pockets occur from a skin tract that is formed and becomes closed off or clogged with skin debri and oils. The pocket of fluid becomes infected, and the pocket expands. This results in an abscess or pocket of pus.

These abscesses are extremely painful, often requiring pain medicines used in post-surgical patients. The reason certainly makes sense, as these abscesses require surgery to correct. Fortunately for Joe, these have been accomplished as in-office procedures. The resulting wounds frequently take weeks to heal, and require near daily visit to the doctor's office for dressing changes and inspection. Often the patient cannot sit without severe pain. It is believed by many, including me, that sitting for long periods of time contribute to these abscesses arising, as well as causing pain during healing. If the pain can be reasonable[sic] controlled, often side affects[sic] of the medications occur, such as drowsiness, or lowering the level of consciousness. Patients may be restricted from driving or the use of machinery. I frequently have patients avoid child-care responsibilities as judgment may be seriously affected by the pain, the pain medicine, or both. Memory deficits can occur, where you "think" you fed the baby, did the safety check, or turned off the engine. Very frequently, the infection itself can cause these side affects[sic] and can be the 1st sign of an infection. Joe has suffered from abscesses such as these between two to four times per year. With weeks being needed for recovery, Joe

has precious little time between episodes, during "bad years." Although Joe is bright and possesses a good work ethic, he has not been able to work very regularly due to absenteeism. This may add up to entire weeks missed during a given month. Jobs that require primarily sitting are very difficult, as a contributor to the development of these abscesses and also in the pain associated with their healing.

As well, Joe has several other medical problems, including Chronic Pain Syndrome, Bipolar Disorder, Degenerative Disk Disease, Fibromyalgia Syndrome, Diabetes Mellitis, and Depression. All of these health problems contribute negatively to Joe's condition, and his ability to function normally on a daily basis. Unfortunately, it is unlikely that Joe will experience much improvement in these conditions over the long run.

(Tr. 520).

Claimant returned on April 2, 2012, and reported back pain with symptoms relieved by pain medications. (Tr. 554). He asked Dr. Collins about surgery inasmuch as he has stopped activities he enjoyed such as hunting and mushroom hunting due to the pain in his back. Claimant indicated that he contacted Mid Missouri Spine Center, but he needed a MRI for back consultation. (Tr. 554). Dr. Collins made a referral for evaluation and treatment at Mid Missouri Spine Clinic and ordered a MRI of his cervical thoracic and lumbar spine. (Tr. 556). In an urgent care visit, Claimant reported an abscess on left buttock with symptoms starting two days earlier on April 9 with aggravating factors including walking and sitting. (Tr. 550). He stated that he has had dozens of cysts and as a result, has difficulty walking. (Tr. 550). Dr. Collins noted that he presented with anal fissure and prescribed Flagyl and Cipro and referred him to Dr. Kermode to be seen as soon as possible for evaluation and treatment. (Tr. 552).

The April 9, 2012 x-ray of his cervical spine showed straightening of the normal lordotic curve. (Tr. 528). The x-ray of his lumbar spine showed normal results. (Tr. 529).

On April 16, 2012, Dr. Kermode noted having removed a pilondal cyst in 1998 and 2012

and noted Claimant to be presently disabled. (Tr. 537). Examination showed an open fistulous tract at the 8:00 position with the coccyx being at the 12:00 position and recommended further diagnostic testing. Dr. Kermode found that he did not think Claimant had an abscess and recommended examination under anesthesia. After noting he is leaving the area in a couple of weeks, Dr. Kermode noted he would refer Claimant to a colorectal surgeon. (Tr. 537).

On April 16, Claimant returned for a medication refill, to discuss pain management, and for follow-up for anal fissue. Claimant reported after completing his evaluation, Dr. Kermode referred Claimant to Columbia for surgery on May 1 to treat his anal fissure. (Tr. 546). Dr. Collins prescribed Fentanyl and MS Contin for his chronic neck pain. (Tr. 548). Dr. Collins noted the x-ray shows the osteoarthritis is in his back and neck region and made a referral for a MRI. (Tr. 548).

In a therapy session on April 26, 2012, Claimant discussed with Ms. Mayberry how he is worried about his court case. (Tr. 522).

Claimant returned on May 2, 2012 complaining of back pain and anxiety. (Tr. 542). He requested being switched back to MS Contin as pain treatment and a refill of Lorazepam for anxiety. (Tr. 542). Dr. Collins found lesions of sacral region and performed osteopathic manipulation treatment to areas of somatic dysfunction. (Tr. 544).

The May 7, 2012 MRI of his cervical spine revealed loss of normal lordosis, otherwise normal results. (Tr. 530). The MRI of his lumbar spine revealed normal results. (Tr. 532). The MRI of his thoracic spine showed normal results. (Tr. 534).

In a letter dated May 20, 2012, Dr. John Small, PhD, recommended disability after

evaluating Claimant. (Tr. 611-12).[4] This evaluation appears to be based on information provided by Claimant. (Tr. 611-12).

On May 30, 2012, Claimant returned for medication refills of morphine and MS Contin and MRI results. (Tr. 538). The MRI results from Missouri Spine Center were normal but show abnormal curvature likely related to chronic muscle spasm. (Tr. 539). He reported exercising two to three times a week. (Tr. 540). The Neuro/Psychiatric review of symptoms was positive for headache but negative for anxiety, depression, or psychiatric symptoms. (Tr. 540). He reported his current medications are managing his chronic neck pain, and Dr. Collins refilled the prescription for morphine and MS Contin. (Tr. 541). Dr. Collins noted that MRIs have no significant pathology, but the reports are not consistent with how Claimant presents on physical examination and referred him to a specialist. (Tr. 541).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the insured status requirements of the Social Security Act through December 31, 2012. (Tr. 14). Claimant has not engaged in substantial gainful activity since April 30, 2010, the alleged onset date. The ALJ found that the medical evidence establishes that Claimant had the following severe impairments: fibromyalgia, asthma, bipolar disorder, depression, and irritable bowel syndrome with recurrent and fissures, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 14-16). The ALJ opined that Claimant has the residual functional capacity to perform light work except that he is limited to sitting no more than two hours out of

---

[4]Further, a physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," 20 C.F.R. § 416.927(e)(1), (3), because it invades the province of the Commissioner to make the ultimate determination of disability. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).

an eight hour workday; should avoid extreme cold and heat, or concentrated exposure to smoke, fumes, dust, or gasses. (Tr. 16). The ALJ further found that he is limited to performing simple and repetitive tasks. (Tr. 17). The ALJ found that Claimant is unable to perform any past relevant work. (Tr. 22).

The ALJ found Claimant was born on September 13, 1974, and was thirty-five years old which is defined as a younger individual on the alleged disability onset date. (Tr.22). The ALJ noted Claimant has a high school education and is able to communicate in English. (Tr. 22). The ALJ noted that the transferability of job skills is not an issue because using the Medical-Vocational Rules supports a finding that Claimant is not disabled whether or not Claimant has transferable job skills. Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ opined there are jobs that exist in significant numbers in the national economy that Claimant can perform such as sales attendant, office helper, and production assembler. (Tr. 22-23). The ALJ concluded that Claimant was not been under a disability from April 30, 2010, through the date of this decision. (Tr. 23).

## V.    Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also

<u>Bowen</u>, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." <u>Pearsall</u>, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." <u>Id.</u> The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The claimant's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The claimant's subjective complaints relating to
      exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the
      claimant's impairments.

6.    The testimony of vocational experts when required which
      is based upon a proper hypothetical question which sets forth the claimant's
      impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly give controlling weight to the opinion of Dr. Collins, his treating doctor. Next, Claimant contends that the ALJ that "absent information from the treating sources, it is not possible to ascertain Plaintiff's ability to work without engaging in medical conjecture."

A.    Weight Given to Treating Doctor's Opinion of March 5, 2012

Claimant contends that the ALJ failed to properly give controlling weight to the opinion of

Dr. Collins.

The ALJ considered the opinion of Dr. Collins in the March 5, 2012 letter and gave little

weight to his opinion in his written opinion as follows:

> Dr. Collins' opinion, while it does provide some explanation of the claimant's
> impairment with respect to his recurrent abscesses, does not provide a function by
> function analysis of what the claimant can or cannot do as a result of his
> impairments.  Dr. Collins opines that the claimant's impairments "contribute
> negatively" to his ability to function normally on a daily basis, but does not explain
> exactly what that means.  Furthermore, much of the opinion is hypothetical in
> nature, referring obliquely to what generic patients "may" experience given the
> claimant's medical conditions.  Given the lack of a function by function analysis
> and the generally vague character of this opinion it is ultimately of little value in
> determining a residual functional capacity for the claimant.  As such, it is afforded
> little weight.

(Tr. 19).

"A treating physician's opinion is given controlling weight if it 'is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [a claimant's] case record.'"  Tilley v. Astrue, 580 F.3d 675, 679 (8th

Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original).  "[W]hile a treating

physician's opinion is generally entitled to substantial weight, such an opinion does not

automatically control because the [ALJ] must evaluate the record as a whole."  Wagner v. Astrue,

499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted).  Thus, "'an ALJ may grant less

weight to a treating physician's opinion when that opinion conflicts with other substantial medical

evidence contained within the record.'"  Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th

Cir. 2000)).  It is the ALJ's duty to resolve conflicts in the evidence, and the ALJ's finding in that

regard should not be disturbed so long as it falls within the "available zone of choice." See Hacker v. Barnhart, 459 F.3d 934, 937-38 (8th Cir. 2006).

A treating physician's opinion may be, but is not automatically, entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. SSR 96-2P, 1996 WL 374188 (July 2, 1996). Even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record. Id. "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009). When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010( (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

In a letter dated March 5, 2012, Dr. Collins opined that Claimant's abscesses caused severe pain when sitting, required near daily visits to the doctor's office, and occurred two to four times a year on average, resulting in excessive absenteeism and thus finding Claimant to be incapable of full-time employment.

The ALJ found the opinion was not entitled to controlling weight, because it was not supported by the objective medical evidence, hypothetical in nature, and lacked function by

function analysis.  It is well-established that if the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.  Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007); Hacker, 459 F.3d at 937.  Indeed, the Eighth Circuit has held:

> A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions.  We have allowed an ALJ to substitute the opinions of non-treating physicians in several instances, including where a treating physician "renders inconsistent opinions that undermine the credibility of such opinions."

Hacker, 459 F.3d at 937 (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).  See Goetz v. Barnhart, 2006 WL 1512176, at *2 (8th Cir. June 2, 2006) (declining to give controlling weight to the treating physician's opinion because the treating physician's notes were inconsistent with her residual functional capacity assessment)).

The ALJ acknowledged that Dr. Collins was a treating source, but that his opinion of March 5, 2012 was not entitled to controlling weight, because it was inconsistent with his prescribed medical treatment .  See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.").  Likewise, Dr. Collins' opinion is inconsistent with his own treatment notes.  Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").  An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler, 459 F.3d at 937 (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment).  Indeed, in his treatment notes Dr. Collins

never set forth any specific limitations on physical activity and in particular, sitting. Dr. Collins'
treatment notes do not reflect the degree of limitation he noted in his March 5, 2012 opinion.
Indeed, he never made a finding of disability or imposed any work related limitations.
Further, as noted by the ALJ, how much of Dr. Collins' opinion is hypothetical in nature referring
to what generic patients may experience given Claimant's medical conditions. "[A] treating
physician's opinion does not deserve controlling weight when it is nothing more than a conclusory
statement." Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008). See also Casey v. Astrue,
503 F.3d 687, 693 (8th Cir. 2007) (finding that "ALJ acted within the acceptable zone of choice"
when declining to give treating physician's RFC assessment controlling weight; opinion was not
supported by any clinical or laboratory diagnostic data); Randolph v. Barnhart, 386 F.3d 835, 839
(8th Cir. 2004) (finding that ALJ had not erred by discrediting opinions and findings of claimant's
treating physician; treating physician completed checklist that mirrored mental impairment's
listing, her treatment notes did not indicate she had sufficient knowledge on which to base her
conclusion that claimant could not work, and she never asked claimant about his abilities to
function in areas that she concluded he could not). The undersigned concludes that the ALJ did
not err in affording little weight to Dr. Collins' opinion of March 5, 2012. Strongson v. Barnhart,
361 F.3d 1066, 1071 (8th Cir. 2004) (holding that it was reasonable for the ALJ to give little
probative value to treating physician's conclusory statement that claimant was vocationally
impaired when such statement was without explanation and was not consistent with physician's
treatment notes).

The ALJ thoroughly reviewed the medical evidence of record and accorded it the weight it
was due. The ALJ gave significant weight to the opinion testimony of Dr. John Pollard, the

impartial medical expert, who testified Claimant could stand for six hours out of an eight hour workday and should avoid prolonged sitting, i.e., he could not sit steadily for six hours out of an eight hour workday. The ALJ found Dr. Pollard's opinion to be consistent with the medical record as a whole. See Hensley v. Barnhart, 352 F.3d 353, 356 (8th Cir. 2003) (finding that ALJ properly discounted treating physician's RFC determination; the opinions conflicted with that given by specialist and the specialist's opinions were consistent with evidence). Claimant's contention that absent information from the treating source, the ALJ cannot ascertain his ability to work without engaging in medical conjecture is without merit. The Eighth Circuit has, however, upheld the Commissioner's RFC in cases where the ALJ did not rely on a treating physician's functional assessment of the claimant's abilities and limitations. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("[T]he ALJ [was] not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians."). See also Stormo v. Barnhart, 377 F.3d 801, 807-08 (8th Cir. 2004) (medical evidence, state agency physicians' assessments, and claimant's reported activities of daily living supported RFC finding). Weighing of the evidence is a function of the ALJ. Masterson v. Barnhart, 363 F.3d 731, 736 (8th Cir. 2004).

Having reviewed the record as a whole and the ALJ's reasoning, the undersigned cannot say that the ALJ was in error when he opined that Dr. Collins' assessment of Claimant's limitations was inconsistent with the objective medical evidence. Nor does the undersigned find that looking at the record as a whole the ALJ erred by opining that Dr. Collins's opinion is inconsistent with his own treatment notes and the findings of non-examining sources and consultative examiners.

In compliance with the applicable regulations, the ALJ assessed the record as a whole to determine whether the treating physician's opinion was inconsistent with other substantial evidence on the record. 20 C.F.R. § 404.1527(d)(2). Having determined that it was, the ALJ properly diminished the weight given to the treating doctor's opinion.

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." <u>Wiese v. Astrue</u>, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted). "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." <u>Id.</u> (quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE


Dated this 5th day of September, 2014.